**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HUDSON GLOBAL RESOURCES ) | |
| HOLDINGS, INC.,  a Delaware corporation, ) | |
| and HUDSON GLOBAL RESOURCES ) | |
| MANAGEMENT, INC., a Pennsylvania ) | |
| corporation, ) | |
|        Plaintiffs, ) | |
| ) | |
|    v. ) | 02:  07cv0132 |
| ) | |
| RALPH H. HILL, JR., an individual, ) | |
| ) | |
|     Defendant. ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

May 25, 2007

Before the Court is the MOTION FOR TEMPORARY RESTRAINING ORDER

AND/OR PRELIMINARY INJUNCTION, with briefs in support (*Document Nos. 2, 6, and 8*

respectively) filed by Plaintiffs, Hudson Global Resources Holdings, Inc. and Hudson Global

Resources Management, Inc. (collectively referred to as "Hudson"), and the response briefs

filed by Defendant, Ralph H. Hill, Jr. ("Hill") (*Document Nos. 19 and 29*).  For the reasons that

follow, a preliminary injunction will be issued because Hudson has made a preliminary

showing of Hill's unauthorized copying of Hudson business files and information some of

which was confidential, proprietary and/or commercially sensitive information.  Therefore, the

Court will enjoin Hill from using or disclosing Hudson's information including confidential or

proprietary business information and order Hill to immediately return to Hudson all materials in

his possession which he downloaded from Hudson's computer network without authorization.

1

This Memorandum Opinion will constitute the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

## PROCEDURAL HISTORY

On February 2, 2007, Hudson filed a Verified Complaint, a Motion for Temporary Restraining Order and/or Motion for Preliminary Injunction, with brief in support, and a Motion for Preservation of Evidence.  In its Verified Complaint, Hudson has brought claims against Hill for fraud under the Computer Fraud and Abuse Act (Count I); breach of fiduciary duty (Count II), misappropriation of confidential information and trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act (Count III), tortious interference with existing contractual relationships (Count IV), tortious interference  with prospective contractual relationships (Count V); and unfair competition (Count VI).

Hudson moves this Court to enjoin Hill from (i) using or disclosing Hudson's confidential or proprietary information and trade secrets; (ii) interfering with Hudson's existing and prospective relationships with its customers and employees; (iii) being employed by Diamond Technical Services, Inc. (Hill's current employer), any other competitor to Hudson, or any other employer in any sales or executive capacity in which Hill would deal, directly or indirectly, with Hudson's existing or prospective customers; (iv) direct Hill to immediately return to Hudson any and all materials in his possession with regard to Hudson; and (v) impose a constructive trust upon any profits or compensation earned by or paid to Hill for any dealings that Hill has had with any Hudson customer or employee since the "initiation of Mr. Hill's wrongful conduct." Mot. for Temporary Restraining Order and/or Preliminary Injunction, at 3-

4.  Hudson also seeks preservation of evidence, which request was granted by the Court on February 13, 2007.[1]

The Court heard testimony and argument on the preliminary injunction on two full days, February 8, 2007, and February 12, 2007.  All parties were represented by counsel who argued the issues skillfully and effectively.  At the conclusion of the hearing, counsel for the parties were directed to file Proposed Findings of Fact and Conclusions of Law on or before March 5, 2007, which deadline was subsequently extended to March 22, 2007.  The parties timely filed their Proposed Findings of Fact and Conclusions of Law.  The transcript of the proceedings was filed on February 23, 2007.   Accordingly, the matter is ripe for disposition.

### FINDINGS OF FACT

A.    Hudson's Business

1.      Hudson provides staffing, quality assurance ("QA"),  inspection services, and nondestructrive testing services ("NDE")[2] to a multitude of commercial and industrial customers, which include electric power producers, manufacturing companies, fabricators, construction companies, and process industries.

2.      Many of Hudson's "employees" and "contractors" who provide QA and NDE services routinely work for Hudson's competitors, as well as Hudson.  There are periods of time

---

[1]      On February 13, 2007, counsel for Hill delivered both Hill's personal computer and portable external hard drive into the custody of the Court.

[2]      Nondestructive testing, or nondestructive examination, also known as "NDE," is "the use of methods that assist the naked eye to identify any potential issues with welding or metals."  Transcript I, p. 172.

in this business when employees/contractors may be laid off for a number of months at a time and therefore available to work for other companies in the field during those periods.

3.      Hudson had taken steps to preserve the confidential and proprietary nature of its information, including maintaining its files on password-protected computer networks, servers, and Hudson-issued computer equipment which limited employee access to its file/information on a need-to-know basis.

B.      Defendant Hill

4.      Hill has approximately twenty-seven (27) years experience in the QA and NDE fields.

5.      Hill was employed by Hudson, or its predecessor companies, on a continuing basis since 1989, most recently serving as the Vice President of Inspection Services since August 11, 2004.  In that capacity, Hill was a mid-level management employee responsible for directly managing Hudson's provision of staffing, QA, and inspection services, directly supervising the Hudson staff and contract employees who perform such services for its customers.   Prior to joining Hudson and its predecessors, Hill had worked in the power industry for ten (10) years.

6.      Hill's work with  Hudson was not of a complex, technical or scientific nature. He reported to Mark Fenske ("Fenske"),  Senior Vice President, who in turn reported to Gregory Lignelli ("Lignelli"), Executive Vice President, who reported to Tom Moran, President of Hudson's energy, scientific, and managed staffing practice group.

7.     Hill had access to all of Hudson's internally-developed files, documents, and materials that related to Hudson's operations, including information which was confidential, proprietary, and competitively sensitive.  Hill knew that he was to use such information solely for the benefit of his employer, Hudson, and not for the benefit of any competitor.

8.     Hudson maintains a corporate policy that "every Hudson employee must sign a confidentiality / non-solicitation and work product assignment agreement."  In approximately February of 2006, Hudson presented Hill with such an agreement, known as a  "HHG Agreement," which included noncompete, non-solicitation, and confidentiality provisions.

9.     Hill, however, refused to sign the HHG Agreement.[3]  Despite his refusal, Hudson chose neither to terminate Hill nor to limit his access to information.[4]

10.     On approximately December 27, 2006, Fenske and Lignelli met with Hill to discuss purported problems with "the way [Hill] was running [his] office."  Transcript I, at 175. During the meeting, Hill questioned whether he "was a fit for the organization any longer" and told Fenske and Lignelli that he "didn't know" whether he was interested in "continuing to support or work at" Hudson.

_____

[3]     It is undisputed that Hill did execute restrictive covenants contained in certain stock option agreements between Hill and two of Hudson's predecessors, SPEC Group Holdings, Inc., and TMP Worldwide, Inc.  Notably, however, Hudson is not a party to these stock purchase agreements and Hudson has failed to provide any evidence which demonstrates that any of the stock purchase agreements contain assignability provisions.  Accordingly, the Court finds that these documents have no relevance in the preliminary injunction decision.

[4]     Mark Fenske testified during the preliminary injunction hearing that he and Gregory Lignelli had discussed Hill's refusal to sign the HHG Agreement, but "determined not to do anything about it" because they did not want to "make it a contentious issue," and because Hill was a "good employee" who "produced a lot of sales for the company."  Transcript II, at 170.

11.     After this meeting, Hudson did nothing to limit Hill's access to information it deemed confidential.  Hill continued to interface with Hudson's clients and to place employees and contractors with Hudson's customers.

12.     On January 4, 2007, Hill told Fenske that he was definitely leaving Hudson's employment.  Hudson was to prepare some type of "exit" or transition agreement under which Hill would agree to stay at Hudson for a time in order to transition another employee into his position. This would also give Hill time to find a new job.

13.     On January 8, 2007, Hill asked Fenske about the transition agreement, but as of January 10, 2007, Hill still had not heard anything.  Hill testified that he was very concerned and assumed that "they [were] going to just get rid of me because I told them I was leaving . . . ."  *Id.* at 179.  Again, Hudson did not restrict Hill's access to company files or information.

C.     Hill's Contacts / Negotiations with Diamond Technical Services, Inc. and Preparation of Business Plan

14.     Diamond Technical Services, Inc. ("Diamond"), is an established business which is a competitor to Hudson in providing staffing, QA, and inspection services to industrial and commercial customers.

15.     On January 10, 2007, Hill called and left a voice mail message for Rich Brennan ("Brennan"), President of Diamond.  Brennan returned Hill's call on January 11, 2007, and the two spoke about the possibility of Hill's employment with Diamond.

16.     Even after Hill contacted Brennan, he continued to inquire about a transition agreement from Hudson in order to get "some idea when [his employment with Hudson] would

6

come to a conclusion." *Id.* at 179.  Each time he inquired about the transition agreement, he was told that human resources was putting something together.

17.      On January 17, 2007, Hill met with Brennan and Diamond's Chief Executive Officer, at which time Hill inquired into whether Diamond would be interested in hiring him for business development.  Later that same day, Brennan called Hill and asked if Hill could put together a business plan for Diamond in the areas of nondestructive examination and testing and QA.

18.      On Saturday, January 20, 2007, Hill began preparing a single-page business plan using an Excel spreadsheet.  Hill testified that he did not use "information of Hudson's," in the preparation of the business plan but he did draw on his work experience with Hudson and upon his seventeen years of general industry knowledge in preparing the plan.  On that same day, he forwarded the draft business plan to Brennan via e-mail.

19.      The next day, January 21, 2007, Hill again met with Diamond representatives.  During this meeting, Diamond extended an oral offer of employment to Hill, which offer was confirmed in writing the next day.  Hill did not accept Diamond's offer until January 23, 2007, after he had submitted his resignation to Hudson.

20.      Hill admits that he prepared the draft business plan while still in the employ of Hudson, that he prepared the plan on his Hudson-issued laptop computer, and that he used the Hudson Energy Forecasting / Scheduling / Project Management tool as a template for the draft business plan.

21.     Fenske testified that he did not know if "any of the numbers" in the draft business plan were from "other documents of Hudson's."  Transcript II, at 182.  Fenske also testified that the draft business plan did not include any customer-specific data.

D.     Hill's Resignation  and Duplication of Hudson's Computer Files

22.     Hill admits that, on the morning of January 22, 2007, while still an employee of Hudson, he accessed Hudson's secure computer network and copied vast amounts of Hudson's files, data and applications from the network to the Hudson-owned laptop computer that had been issued to him for use solely in connection with Hudson business.  That same day, Hill copied all of these same files and information from the Hudson laptop computer to his portable external hard drive.

23.     The files copied by Hill included, among other things, Hudson's QA manual and procedures,  Hudson's Radioactive Materials Operations and Emergency Procedures Manual, pricing and marketing strategies, and internal cost and margin data, including the wages paid to Hudson employees and billing rates to Hudson's customers; customer-specific project schedules; and customer-specific proposals.   Specifically, Hill copied approximately 11,380 separate and distinct files, which comprised 8.2 gigabytes of data, which equates to approximately 550,000 pages of text.  Hill acknowledged that some of the copied materials were considered by Hudson to be confidential, proprietary and competitively sensitive.

24.     Hill candidly admitted that he downloaded these materials to assist him in writing a NDE /QA program for Diamond.  Hill also testified that he has never accessed, used or transferred any of the material that he had downloaded and copied to his portable external

8

hard drive since the day it was copied, January 22, 2007. He said that all of the files which he copied are and remain on the portable external hard drive and it has never been plugged in or accessed since that day.

25.     The Court finds that there is no evidence that any of the material that Hill downloaded and copied from Hudson's computer network on January 22, 2007, was ever provided to anyone at Diamond or anyone else. Fenske acknowledged that he had no proof that Hill had actually used any of the downloaded information.

26.     The Court finds that Hill's testimony is credible, both generally and specifically as to his assertion that he never used or transmitted to Diamond any of the computer files and data he admittedly downloaded and copied.

27.     On January 23, 2007, Hill submitted a letter of resignation to Hudson, in which he expressed an intention to continue in his position at Hudson until February 2, 2007. On that same day, Hudson presented a draft agreement for Hill to sign which provided that in exchange for Hill's agreement to abide by certain non-compete, non-solicitation and confidentiality provisions, Hudson would any Hill a $14,655 "lump sum payment." Hill declined to accept the proposed agreement and payment; however, Hill offered and Hudson agreed that Hill should continue "performing his normal course of duties" until February 2, 2007, in order to facilitate a smooth transition.

28.     On this same day, January 23, 2007, Hill executed a written employment contract with Diamond which stated that he would serve as Diamond's Manager of QA and NDE Services. The employment contract provides that Hill is responsible for "establishing and maintaining the Non-Destructive Examination (NDE) and Quality Assurance (QA) program at"

Diamond and "establishing written procedures for NDT inspections and provide [sic] written practice[s] for training and certification of NDT personnel in accordance with the American Society of Non-Destructive Testing."  Transcript II,  at 219.

29.     Hill's employment contract with Diamond also provides that if he is successful in bringing customers and employees to Diamond, his employment is guaranteed for a minimum of five (5) years.

30.     On or about January 23, 2007, after tendering his resignation to Hudson, Hill contacted Holtec, one of Hudson's largest customers, and informed Holtec that he was leaving Hudson.

31.     On January 24, 2007, Hill sent an e-mail to the personal home e-mail address of a Hudson employment candidate, Warren Columbus ("Columbus").  Columbus had worked intermittently for Hudson and its predecessors for over ten (10) years.

32.     Hill attached to the e-mail a single-page schedule of Hudson's QA work for a utility company for the spring 2007 outage season.[5]

33.     At the time Hill sent the e-mail, Columbus was working as a contract inspector for Diamond.  Hill testified that he contacted Columbus to see if Columbus, or anyone he knew "could fill any of the open positions that were on that sheet."  Transcript I, at 135.

---

[5]     An "outage is when they shut down a power plant to assess the condition of it and to do scheduled repairs."  Transcript I, at 166.  Scheduled outages are not "uniquely known by Hudson," but are "known to all other firms that are in the business basically."  *Id.*

34.     Hill testified that the e-mail contains no "confidential" information as "all the names on there, Diamond knows those guys.  They're on the same projects we are . . . . Every project that Hudson went to, Diamond is doing their own function."  *Id.* at 183.

35.     On this same day, Hill forwarded various other Hudson files from Hudson's computer network to a personal e-mail account owned by Hill and/or his family.  Some of the files forwarded included scheduling sheets, workforce contracts and documents reflecting Hudson's pricing strategies.

36.     Hill testified that he sent these documents to his home computer because he had been told by Fenske that he was "not able to take [his] laptop home any longer" and that was "all work [he] still needed to execute as a Hudson employee."  *Id.* at 139.  Hill further testified that he did not understand these documents to be "competitively sensitive information of Hudson."

37.     On January 24, 2007, Hill also forwarded an e-mail to his home e-mail account from another Hudson employee, Jeff Stonebreaker, which attached a resume of a candidate with whom Hudson did not have a business relationship.  Hill testified that he reviewed the resume as part of his duties with Hudson during the period following his notice of resignation and he did not understand that Hudson regarded this e-mail as "competitively sensitive."

38.     The next day, January 25, 2007, Hill sent a final e-mail to his home e-mail account, which forwarded an e-mail from Rick Allen, another Hudson employee, dated January 23, 2007.  Hill testified that he "sent it home to review it.  It was new cost information, brand new pricing.  I could not bring it home on my laptop.  I sent it home on my computer so I could review it and approve or disapprove it."  *Id.* at 140.

11

39.     Hill testified that the pricing information would not be of use to him at Diamond as "I know what we pay for these things.  I know this information.  I would just go to them and get pricing from them.  The pricing from them would be whatever they give us."  *Id*. at 141.

40.     Lignelli acknowledged during his testimony that the pricing information was supplied by a vendor, and not by Hudson, and that Diamond could get its own quote from the same vendor.  Transcript I  at 81-82.


E.     Hill's Termination from Hudson

41.     On January 25, 2007, upon learning of Hill's e-mail to Columbus and e-mails to his home e-mail account, Hudson immediately terminated Hill's employment.  Lignelli and Fenske personally escorted Hill from the building.  Hudson retained Hill's company-owned laptop computer.

42.     Hudson quickly discovered that Hill had "copied information from [the server] to his hard drive on the actual laptop computer."  Transcript I, at 39.

43.     On January 25, 2007, shortly after he was terminated by Hudson, Hill contacted a representative of Reliant, another of Hudson's largest customers, and informed Reliant that he had left Hudson and was joining Diamond.

44.     Within one day of Hill's termination, Fenske notified Hill that Hudson had learned of Hill's downloading of Hudson's computer files.   Hill responded by separately contacting Fenske and Lignelli by telephone and e-mail, he immediately acknowledged copying the material, apologized profusely for doing so, and offered to return the copied materials to Hudson.  Hill acknowledged that he "should not have done that" but he assured Fenske that the

12

information "had not gone anywhere."  Transcript I, at 143.  Hill requested to return to Hudson's

employ to "put this matter behind us" and offered to sign a non-compete agreement if he got his

job back.  Hudson declined to rehire Hill.

45.      On January 30, 2007, Hill attended a pre-scheduled meeting with Holtec's quality

assurance manager, at which time Hill explained that Diamond was establishing an NDE / QA

program and requested that Holtec consider Diamond for its staffing and NDE needs in the

future.

46.      On or about February 3, 2007, upon learning that Alstom, another of Hudson's

largest customers, had an open QA position, Hill contacted Alstom and arranged for Diamond to

fill that vacant  position with Greg Prebish, a former Hudson employee who joined Diamond

before Hill did.

47.      On February 2, 2007, Hudson commenced this action and on Sunday, February 4,

2007, Hill was served with the Complaint and Hudson's Motion for Temporary Restraining

Order and/or Motion for Preliminary Injunction.

48.      On February 6, 2007, Hill physically conveyed the portable external hard drive

and his home computer to his attorneys.  Both the portable external hard drive and the home

computer were delivered to the Court on February 13, 2007, following the second day of hearing

in this matter and these items remain in the custody of the Court.

49.      Hill officially joined Diamond on January 29, 2007, as Manager of QA and NDE

Services.[6]  Since joining Diamond, Hill has arranged to purchase from third-party vendors

---

[6]      Initially, Hill's start date was to be February 5, 2007; however, due to his
termination from Hudson, he started earlier than originally planned.

"[e]verything needed" to establish Diamond's own "quality assurance program, implementing procedures, procedure on how to certify inspectors, and test questions for the certification of inspectors, and additionally actual test procedures," in full compliance with all applicable regulations.  Transcript II, at 208.

50.    Hill testified that prior to his termination from Hudson, he did not take any steps to "move any Hudson clients to Diamond."  Transcript I at 173.  Additionally, Hill testified that he did not arrange for any Hudson employee to join him at Diamond or make any commitments to any Hudson employee that once he went to Diamond he would give them a job.  *Id.* [7]

F.    Testimony of Greg Cancilla of JurInnov, Ltd.

51.    Greg Cancilla ("Cancilla") of JurInnov, Ltd., was presented by Hudson as an expert witness in computer forensics investigation and analysis.  Cancilla testified to the significant magnitude of the Hudson data that Hill accessed, downloaded and copied on January 22, 2007.  Cancilla also testified that it was impossible to determine with any degree of certainty

---

[7]    Attached to Hudson's Proposed Findings of Fact and Conclusions were (1) the Affidavit of Linda A. Vrentas with accompanying documents regarding various stock option agreements Hill had signed with Hudson's predecessors and (2) the Affidavit of Mark Fenkse.   Hill objects to the admission of either of these affidavits.  The Court finds Hill's position to be reasonable and, therefore, has not considered either affidavit in making its ruling on the preliminary injunction. First, the record on the preliminary injunction hearing had closed and Hudson did not seek nor had it obtained leave to supplement the record.  Moreover, Hill was not afforded the opportunity to cross-examine the affiants as to the subject matter of their affidavits or to submit his own evidence concerning the subject matters of these Affidavits.

Also, Plaintiffs' Exhibit 35 was not admitted into evidence or considered by the Court.

or reliability what, if anything, Hill had done with the information that he copied from Hudson's

computer network to his portable external hard drive. Cancilla opined that Hill could have

transferred the information from his portable external hard drive to a limitless number of other

devices without leaving any trace of the transfer on the portable external hard drive, however, he

did not know whether any such transfer of data had actually occurred.  Any and all of such

information can be deleted from the portable external hard drive, but any transferred information

cannot be traced or retrieved.


## CONCLUSIONS OF LAW

A party which seeks a preliminary injunction must demonstrate the following four

factors: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the

injunction is denied; (3) that granting a preliminary relief will not result in even greater harm to

the nonmoving party; and (4) that the public interest favors such relief." *KOS Pharmaceuticals,*

*Inc. v. Andrx Corp*., 369 F.3d 700 (3d Cir. 2004). Preliminary injunctive relief is "an

extraordinary remedy" and "should be granted only in limited circumstances." *American Tel. &*

*Tel. Co. v. Winback & Conserve Program, Inc*., 42 F.3d 1421, 1427 (3d Cir. 1994), *cert. denied*,

514 U.S. 1103 (1995).  "The injunction should issue only if the plaintiff produces evidence

sufficient to convince the district court that all four factors favor preliminary relief."  *Id*.

A court considering whether to grant a preliminary injunction may assess the credibility

of the witnesses testifying before it at a preliminary injunction hearing, and base its decision on

its credibility determinations. *See Philadelphia Newspapers, Inc. v. Newspaper & Magazine*

*Employees Union*, 647 F. Supp. 236 (E. D. Pa. 1986) (granting preliminary injunction after considering, inter alia, the testifying witnesses' demeanor and credibility).

During the hearing on the preliminary injunction, Hudson's primary focus was on Hill's copying of vast amounts of Hudson's "confidential and proprietary data and applications from Hudson's computer network." As explained *infra*, the Court finds and rules that Hudson has produced sufficient evidence for this Court to enjoin the use and/or disclosure by Hill of all of Hudson's information including confidential or proprietary business information downloaded and copied from Hudson's computer network without authority. However, the Court finds and rules that the remainder of Hudson's broad request for injunctive relief will not be granted.

A.   Has Hudson Shown That It Will Likely Succeed On The Merits of Its Claims Under the Computer Fraud and Abuse Act

1.   Hill has specifically avoided and refused to sign any non-compete or non-solicitation agreement with Hudson. Therefore, Hudson must prove that Hill has or will improperly compete and "use confidential and trade secret information obtained as a result of the trust and confidence of" his employment with Hudson. *Colteryahn v. Schneider Dairy,* 203 A.2d 469, 471 (Pa. 1964).

2.   However, Hill's "aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer. . . ." *Spring Steels, Inc. v. Molloy*, 162 A.2d 370, 373 (Pa. 1960). Likewise, facts and information that are "imbedded in the mental processes" of the former employee are not the property of the former employer. *Colteryahn,* 203 A.2d at 472.

16

3.      Hudson has not introduced any evidence that Hill has actually improperly misused any of its purportedly confidential and proprietary information.  The Court finds Hill's testimony to be credible that he did not share the Hudson information with Diamond.  Further, the Court finds that the purpose of the e-mail to Columbus was as Hill testified to seek contractors for open time slots and not to divulge confidential information to Diamond.  Further, the names on the schedule attached to the Columbus e-mail were otherwise known to Diamond and that scheduling information could easily have been obtained simply by asking one of the contractors, who all work on the same "projects."

4.      Hill, when confronted a day after his termination and before actual commencement of his employment with Diamond, immediately admitted that he copied Hudson computer files onto his portable external hard drive, apologized, and conceded that he should not have done so and advised that he had not transferred any of the information to  Diamond or anyone else.  He offered to immediately return the information and asked for his job back.  Hill's candor in this regard persuades the Court as to his credibility in his denial of having used or transferred the Hudson information to or for Diamond's benefit.  Further, the Court has been in possession of the portable external hard drive and Hill's personal home computer since February 13, 2007.  He also testified that his attorney was in possession of those items from February 6-13, 2007.

5.      However, it remains that both Hudson's computer network and Hill's Hudson-issued laptop are "protected computers" within the meaning of the Computer Fraud and Abuse Act ("CFAA").  18 U.S.C. § 1030(e)(2)(b).

6.   In downloading and copying Hudson's files, which Hill admittedly knew to be wrong, Hill acted "knowingly" and with "intent to defraud" in violation of the CFAA. 18 U.S.C. § 1030(a)(4).

7.   Hudson has incurred "losses" sufficient to exceed the $5,000 monetary threshold required in section 1030(g) of the CFAA. *See* Memorandum Opinion and Order of Court, filed March 2, 2007 (Document No. 24).

8.   The Court finds, based on the current record, that Hill has at a minimum committed fraud in violation of § 1030(a)(4) of the Computer Fraud and Abuse Act.


B.   <u>Has Hudson Shown Irreparable Harm</u>

9.   Courts will protect an employer by issuing injunctive relief to enjoin and restrain a former employee from using or disclosing the employer's confidential information and trade secret information to the employer's competitors. *See, Fisher Bioservices, Inc. v. Bilcare, Inc.,* No. 06-567, 2006 WL 1517382 (E.D. Pa. May 31, 2006) (granting injunctive relief to an employer enjoining a former employee from using and directing her to return confidential information and trade secrets that she had misappropriated from the employer).

10.   Accordingly, the Court finds that Hudson can be protected from Hill's isolated act of copying purportedly confidential and proprietary information by the issuance of an injunction which will bar Hill from possession or use of any and all of Hudson's information.

C.    Does The Harm to Hill Outweigh the Harm to Hudson

11.    The Court finds and rules that enjoining Hill from conducting or performing any business or employment with Diamond or any other competitor of Hudson would be a drastic and unwarranted measure in this case.  Such a broad injunction would place a significant and severe restriction on Hill's ability to earn a livelihood after having worked in this general industry for nearly twenty-seven years.  *See Emerson Electric Co. v. Buffington,* Civ. No. 06-1562, 2006 WL 2709750, ** 1, 3 (E.D. Pa. Sept. 19, 2006) (refusing to preliminary enjoin defendant from working for new employer notwithstanding fact that defendant had downloaded "confidential information" which belonged to his employer onto an external "memory stick"); *HUB Group, Inc. v. Clancy*, Civ. No. 05-2046, 2006 WL 208686 (E.D. Pa. Jan. 25, 2006) (dissolving temporary injunction entered against former employee who had e-mailed employer's detailed pricing and customer list to his wife's e-mail account prior to leaving to work for a competitor where uncontroverted testimony was that employee never used the information); *Iron Age Corp. v. Dvorak*, 880 A.3d 657, 665 (Pa. Super. 205) (affirming denial of preliminary injunction seeking to prevent former employee from competing with former employer where former employee had "returned all of the pertinent [confidential] materials to [former employer]").


D.    The Public Interest

12.    Hudson argues that adopting a "no harm, no foul" attitude towards Hill's actions would legitimize the type of "theft" alleged in this case and that "it is symptomatic of a decline in business ethics."

13.   Based on the record evidence and arguments of counsel, the Court holds that there is a strong public interest in granting Hudson partial injunctive relief.  However, the Court finds that Hudson is not entitled to as broad a preliminary injunction as it seeks, which would literally bar Hill from working for Diamond or any other competitor in the industry with there being no contractual non-compete, non-solicitation or restrictive covenant of any type in effect. The Court does, however, have an obligation to enjoin Hill from using or disclosing Hudson's confidential and proprietary information.

14.   Accordingly, Hill will be enjoined from using or disclosing Hudson's information including confidential and proprietary business information and he will be directed to return all files, data and information which Hill downloaded and copied from Hudson's computer network.

## CONCLUSION

The Court finds and rules that Hudson has established the four elements necessary for a limited preliminary injunction to issue.  The Court has concluded that the copying by Hill of Hudson computer files onto his portable external hard drive and personal computer violates the CFAA, that Hudson will be irreparably harmed if Hill shares this information with Diamond or others, that Hill will not be harmed to a greater degree than Hudson by the issuance of such an injunction, and that the public interest is served by enjoining Hill from using any material, especially confidential and proprietary information, which he downloaded and copied from Hudson's computer system.

The Court will therefore grant, in part, Hudson's request for preliminary injunctive relief. The Court will enjoin Hill from using or disclosing in any way all of Hudson's information which Hill copied including confidential and proprietary business information during the pendency of this lawsuit and Hill will be directed to return all of Hudson's information including confidential and proprietary information, which he downloaded to his portable external hard drive and/or his personal computer (which are in the custody of the Court) or which Hill otherwise possesses in hard copy or any other format whatsoever.

The Court will direct counsel to confer and suggest within ten (10) days an agreeable method by which Hudson, through its computer forensics expert or otherwise, may access and permanently delete or retrieve all of its information, especially its confidential and proprietary business information from Hill's portable external hard drive and personal computer, which are in the Court's custody.  Also counsel for Hill is directed to report to the Court in the same time frame by affidavit of his client regarding any other information including confidential and proprietary business information of Hudson which Hill possesses in any other format whatsoever, all of which must be returned to Hudson with no copies retained by Hill or anyone on his behalf.

### The Security Bond Requirement

Federal Rule of Civil Procedure 65(c) generally requires the posting of a security bond.[8] While our appellate court has held that such a security bond may be waived in certain limited

---

[8]      Federal Rule of Civil Procedure 65(c) provides in relevant part:
(c)  Security.  No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained . . . .

situations, it also has cautioned that "[w]hile there are exceptions, the instances in which a bond

may not be required are so rare that the requirement is almost mandatory." *Frank's GMC Truck*

*Center v. General Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988).  *See also Temple Univ. v.*

*White,* 941 F.2d 201, 219 n. 26 (3d Cir. 1991) (listing other circuit court decisions which have

held that a district court may waive the bond requirement and describing the narrowly drawn

circumstances for such waiver), *cert. denied,* 502 U.S. 1032 (1992).

     The Court finds and rules that there are no exceptions present in this case which would

warrant the waiver of a security bond.  Accordingly, after due consideration, the Court will order

that Hudson shall post a security bond in the amount of Five Thousand Dollars ($5,000.00).

     An appropriate Order follows.


                                    McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HUDSON GLOBAL RESOURCES | ) | |
| HOLDINGS, INC.,  a Delaware corporation, | ) | |
| and HUDSON GLOBAL RESOURCES | ) | |
| MANAGEMENT, INC., a Pennsylvania | ) | |
| corporation, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 02:  07cv0132 |
| | ) | |
| RALPH H. HILL, JR., an individual, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER OF COURT**

AND NOW, this 25th day of May, 2007, in accordance with the foregoing Memorandum

Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that Plaintiffs' Motion for

Temporary Restraining Order and/or Preliminary Injunction *(Document No. 2)* is **GRANTED**

**IN PART AND DENIED IN PART.**

Defendant Ralph H. Hill, Jr., is immediately **ENJOINED** and shall hereafter during the

pendency of this lawsuit be enjoined from using or disclosing in any manner whatsoever all of

Hudson's information which he improperly downloaded from Hudson's computer network

system including all confidential and proprietary business information and he is **ORDERED** to

return to Hudson any and all of such information forthwith.

Further, it is **ORDERED** that counsel shall confer and suggest within ten (10) days of

the issuance of this Order an agreeable method by which Hudson through its computer forensics

expert or otherwise may access and permanently delete or retrieve all of its information

especially confidential and proprietary business information from Hill's portable external hard drive and personal computer which are in the Court's custody.

Also counsel for Hill is **ORDERED** to report to the Court in the same time frame by affidavit of his client regarding any other information including confidential and proprietary business information of Hudson which Hill possesses in any other format whatsoever, all of which must be returned to Hudson with no copies retained by Hill or anyone on his behalf.

It is further **ORDERED** that Plaintiffs, Hudson Global Resources Holdings, Inc., and Hudson Global Resources Management, Inc., shall forthwith file with the District Court Clerk a security bond in the amount of Five Thousand Dollars ($5,000.00).


BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge



cc:     Robert M. Linn, Esquire
        Cohen & Grigsby
        Email: rlinn@cohenlaw.com

        Eric S. Newman, Esquire
        Cohen & Grigsby
        Email: enewman@cohenlaw.com

        Adrian N. Roe, Esquire
        Watkins Dulac & Roe P.C.
        Email: aroe@watkinsdulac.com

        Kenneth J. Witzel, Esquire
        Watkins, Dulac & Roe P.C.
        Email: kwitzel@watkinsdulac.com